943 F.2d 335
 21 Fed.R.Serv.3d 210
 UNITED STATES of America
v.
TABOR COURT REALTY CORP.; Raymond Colliery Co., Inc.;
McClellan Realty Co., Inc.; Lackawanna County; Pagnotti
Enterprises, Inc.; Loree Associates; James J. Tedesco;
Henry Ventre; Louis Pagnotti, II; Blue Coal Company;
Gillen Coal Mining Co.; Carbondale Coal Co.; Moffat
Premium Anthracite; Northwest Mining, Inc.; Maple City
Coal Co.; Powderly Corporation; Clinton Fuel Sales, Inc.;
Great American Coal Co.; Joseph Solfanelli, individually
and as trustee; General Electric Credit Corp.; Comm. of
Pa, Dept. of Mines & Mineral Industries, Dept. of
Environmental Resources and Dept. of Revenue; Borough of
Olyphant; John J. Gillen; Thomas J. Gillen; Robert W.
Cleveland & Sons, Inc.; William T. Kirchoff; Jay W.
Cleveland; Royal E. Cleveland; City of Scranton Sewer
Authority; Lackawanna River Gleneagles Investment Co.,
Inc.; Jeddo Highland Coal Co.; Olyphant Premium
Anthracite, Inc.; Olyphant Associates; Minindu
Corporation; Glen Nan, Inc.; Gilco, Inc.; Jay W.
Cleveland, As Administrator of the Estate of Royal E. Cleveland.
Carrier Coal Enterprises ("Carrier"), Appellant.
 No. 90-5802.
 United States Court of Appeals,
Third Circuit.
 Argued March 6, 1991.
Decided Sept. 5, 1991.
As Amended Sept. 10, 1991.
 
 John G. Whelley, Jr. (argued), Francis G. Wenzel, Jr., Joseph G. Ferguson, Rosenn, Jenkins & Greenwald, Wilkes-Barre, Pa., for appellant Carrier Coal Enterprises.
 Thomas I. Vanaskie (argued), Thomas D. Brown, Dilworth, Paxson, Kalish & Kauffman, Scranton, Pa., George A. Spohrer, Hourigan, Kluger, Spohrer & Quinn, P.C., Wilkes-Barre, Pa., for appellee Scott F. Linde.
 Thomas P. Brennan, Gallagher, Brennan & Gill, Wilkes-Barre, Pa., for appellee Thomas H. Kiley, Receiver for Raymond Colliery Co., Inc.
 Before BECKER, NYGAARD and HIGGINBOTHAM, Circuit Judges.
 OPINION OF THE COURT
 A. LEON HIGGINBOTHAM, Jr., Circuit Judge.
 
 
 1
 This appeal is from the denial of Appellant's motion for an order directing a court-appointed Receiver to convey property pursuant to an assignment of an Agreement of Sale. Subject matter jurisdiction in the district court was based on 28 U.S.C. § 1331 and 26 U.S.C. § 7402(a). This court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.
 
 I.
 
 2
 This dispute arises out of the district court's protracted efforts to dispose of the foreclosed upon properties of the Raymond Colliery Co., Inc. Thomas H. Kiley, Receiver of the properties, was authorized by the district court to seek purchasers and apply to the court for approval of the sale. (App. at 38). The highest appraisal value for the land and coal was $1,283,294. The Receiver was authorized to receive not less than 110% of the appraised value of the property (i.e., $1,411,234). (App. at 40). Scott F. Linde began negotiations with the Receiver for the seven parcels of land in May, 1988.[1] The Receiver provided Linde with a copy of a proposed Agreement of Sale which expressly prohibited assignment of the agreement without the Receiver's written approval. Linde's co-investors only agreed to invest, however, on the condition that the entire agreement of sale be assignable to Carrier Coal Enterprises. (App. at 850). At a meeting with the Receiver on May 20, 1988, Linde requested two modifications of the agreement which the Receiver granted without consulting his counsel--1) the agreement was modified to divide the realty transfer taxes equally between buyer and seller; and 2) the paragraph prohibiting assignment without the Receiver's written permission was deleted and the buyer designated as "Scott F. Linde or his assigns." (emphasis added). The agreement of sale was then executed under the above conditions for $1,483,000. There is no evidence of record that Linde had any discussion with Carrier concerning the subject matter of the agreement of sale prior to entering into the agreement of sale with the Receiver. (App. at 851).
 
 The First Public Sale
 
 3
 On August 8, 1988, the district court approved the agreement of sale on the condition that the sale was subject to certain requirements. The requirements included advertisement of the sale, the acceptance of higher bids and final confirmation by the court. (App. at 853). The advertisement provided that until 10:00 a.m., September 2, 1988, any person might bid on the land so long as the purchase price was not less than 110% (i.e. $1,631,300) of the price that Linde was to pay. Two weeks prior to September 2, 1988, Murray Ufberg, attorney for Carrier, telephoned Allan Kluger, attorney for Linde, and proposed the assignment. Kluger asked for $200,000 plus a reconveyance of one of the parcels of land[2] which had an appraised value of $74,000. (Supplemental Briefing Documents). On September 2, 1988, Linde and Carrier negotiated in the hallway outside of the Receiver's office for approximately fifteen minutes and agreed to the assignment.[3] The parties then informed the Receiver, in his office, that Linde would be assigning his rights to Carrier and Carrier would not be submitting a bid to the Receiver. (App. at 855-56). Although the Receiver voiced his disapproval, the parties returned to the hallway and finalized the assignment agreement.
 
 
 4
 On September 13, 1988, the Receiver, believing that Linde had breached the agreement of sale by the assignment to Carrier, refused to proceed with the sale, and filed a motion to impose remedies for unlawful interference with a court directed sale of real property. (App. at 47). The Receiver maintained that Linde had breached the agreement and that the assignment was collusive and an unlawful frustration of the bidding process. Both Linde and Carrier opposed the Receiver's motion.
 
 
 5
 Disapproval of the Assignment & The Second Public Sale
 
 
 6
 On January 9, 1989, the district court ordered a hearing to determine if Linde and Carrier had entered into a collusive agreement. On January 24, 1989, the district court found that the assignment improperly stifled the competitive bidding process and depressed the price to be paid to the Receiver. (App. at 140). The court expressed the belief that it was not necessary to decide whether there was actual collusion between Carrier and Linde. (App. at 145). The court invalidated the sale to Linde, explicitly disapproving the assignment between Carrier and Linde, and ordered the Receiver to reopen the bidding process.
 
 
 7
 Linde appealed the district court's decision, filing a Notice of Appeal on February 22, 1989. On March 29, 1989, the district court denied Linde's motion to stay the bidding proceedings pending appeal. In keeping with the district court's holding that the sale to Linde was invalid, the Receiver scheduled a second public sale. At the second public sale on May 26, 1989, Carrier offered, and the Receiver accepted, a bid of $1,631,300, the minimum required bid. Linde opposed approval of the sale to Carrier arguing that the first sale was valid.
 
 Return of the Escrowed Assignment Funds
 
 8
 On March 15, 1989, Allan Kluger, one of Linde's attorneys who was also acting as Escrow Agent, wrote to Murray Ufberg, Carrier's attorney and the other Escrow Agent. In that letter, Kluger proposed to return the $200,000 assignment payment to Carrier. "It would appear to me that in view of the decision of Judge Muir, the money should be returned to your client." (Supp. Briefing, Exhibit D). On March 29, 1989, Carrier's other attorney, Robert Spielman, stated that Carrier preferred to permit the payment to remain in escrow until the appeal of "Judge Muir's decision concerning the legal propriety and enforceability of the assignment agreement" was resolved. (Supp. Br. Exhibit E). Spielman also added that it was Carrier's understanding that it would be entitled to the return of the accrued interest in addition to the principal if the Third Circuit found that the assignment agreement was unenforceable or otherwise legally invalid.
 
 
 9
 On May 30, 1989, Murray Ufberg wrote to Allan Kluger requesting that he "forward a check to him today made payable to Carrier." (Carrier Supp. Briefing, Exhibit B). Ufberg also requested that Kluger obtain a check for the interest made payable to Carrier, "after you have had an opportunity to verify the appropriateness of doing so with the Lindes." (Carrier Supp. Briefing, Exhibit B). On May 31, 1989, after receiving the check for $206,805.67, Ufberg forwarded it to Carrier, explaining that he and Kluger had agreed that the return of the money did not invalidate the assignment for the purpose of the Linde appeal pending before the Third Circuit. The appeal only "obviate[d] the continued need for escrowed funds in connection therewith." (Carrier Supp. Briefing Exhibit C).
 
 
 10
 Following the Third Circuit's reversal of the district court's disapproval of the sale, Ufberg wrote to Kluger on November 15, 1989 to protest Linde's statement in its response to Carrier's motion for rehearing (discussed below) that Carrier had requested the return of the money. "In our initial discussion [following Kluger's offer to return the money] we agreed that, whether our client wanted the money or not, your intent in making the offer was only to eliminate further administration of the money and was not intended to obviate the Assignment." (Carrier Supp. Briefing, Exhibit D). On December 14, 1989, Kluger (Linde's attorney) wrote to Thomas Vanaskie (Linde's appellate counsel) explaining his agreement with Ufberg that the return of the $200,000 would not affect the assignment. (Linde Supp. Briefing, Exhibit H).
 
 Linde's Appeal to the Third Circuit
 
 11
 On appeal to the Third Circuit, Linde's appellate brief argued that he had the right under the agreement of sale to assign his interest. He requested that the district court's January 24, 1989 order be reversed and that the court be required to enforce the agreement between Linde and the Receiver. Carrier filed a separate two-page brief in which it adopted Linde's brief in full and raised an additional argument about allegedly imprecise bidding procedures leading Carrier to enter into the assignment.[4] On July 10, 1989, at oral argument, Linde ceded three minutes of its time to Carrier to make its above-described argument.[5]
 
 
 12
 In an unpublished memorandum opinion, dated October 12, 1989, the panel concluded that neither the inadequacy of the purchase price nor the assignment to Carrier was a sufficient reason for the district court to set aside the assignment or refuse final approval of the sale absent collusion, fraud, unfairness or mistake in the conduct of the sale. 888 F.2d 1383. The district court's January 24, 1989 order was reversed and the matter was remanded to the district court with instructions to "either enter an order confirming the sale from the Receiver to the appellant or to conduct a further hearing to determine if there was any collusion in the conduct of the sale." (App. at 493).
 
 Carrier's Request for Panel Rehearing
 
 13
 On October 17, 1989, counsel for Carrier, Mr. Spielman, communicated by letter (and later in a request for panel rehearing) his belief that the Court of Appeals should have directed the district court to convey the property to the appellant's assignee (i.e., Carrier). To do otherwise, he argued, would be to order the district court to do exactly what it had been reversed on--disapproval of the assignment. Linde opposed this request arguing that he had not appealed the disapproval of the assignment to Carrier--rather, he had appealed the district court's refusal to grant final approval of the sale because the refusal was based on Linde's assignment to Carrier. Linde also stated that, following Carrier's failure to timely appeal the district court's disapproval of the assignment, he had executed a second assignment to Lackawanna Land & Energy "for additional support in prosecuting [the] appeal." (App. at 510). Scott F. Linde is a principal shareholder and Vice-President of Lackawanna Land & Energy.
 
 
 14
 Carrier's petition for rehearing was denied by the Court of Appeals on December 21, 1989. (App. at 500). Although the petition was filed by Carrier, which referred only to itself as the "party to the agreement" or "appellant's assignee", the panel in its denial erroneously described the petition as one filed by the "appellant." (App. at 525).[6]
 
 Proceedings on Remand
 
 15
 On remand, the district court conducted an extensive hearing on the question of collusion and concluded on May 23, 1990 that there had been no collusion between Carrier and Linde in the conduct of the September 2, 1988 sale. (App. at 845). The court decided that although there was evidence that Linde may have fraudulently induced the Receiver to alter the contract, this was an insufficient ground to set aside the sale absent evidence that Carrier knew of the fraud. (App. at 14-15). Accordingly, the district court ordered that the original sale to Linde under the terms of the Agreement of Sale was confirmed. (App. at 863).
 
 Carrier's Motion for Conveyance
 
 16
 On May 30, 1990, Carrier requested the Receiver to convey the property to Carrier as Linde's lawful assignee. (App. at 865). On May 31, 1990, Linde requested the Receiver to convey the property to Lackawanna Land & Energy as its lawful assign. (App. at 865). On June 1, 1990, the Receiver informed Carrier that it was unwilling to convey to Carrier. (App. at 866). On June 8, 1990, Carrier filed a motion with the district court--a "Motion for Entry of Order Directing Receiver to Convey Real Estate Interests." (App. at 864). On August 15, 1990, the district court denied Carrier's motion reasoning that
 
 
 17
 "the motion was not a proper vehicle for a determination of Carrier's rights, if any, against Linde. The Receiver's function under the mandate of the Court of Appeals was and is to convey to Linde and he has no interest in the dispute between those parties."
 
 
 18
 (App. at 875). The district court also noted that "Carrier's rights under the assignment may have been extinguished by our disapproval of the assignment. Carrier may well have been obliged to appeal from our [January 24, 1989] order if it sought relief from our determination." (Id. citing Morley Constr. Co. v. Maryland Casualty Co., 300 U.S. 185, 57 S.Ct. 325, 81 L.Ed. 593 (1937)).
 
 Carrier's Appeal to the Third Circuit
 
 19
 On September 5, 1990, Carrier appealed the district court's denial of its motion.[7] On September 17, 1990, Carrier filed an action for specific performance in the Court of Common Pleas of Lackawanna County against Linde and the Receiver. On September 28, 1990, the Receiver removed the action to the District Court. On October 9, 1990, Linde and Lackawanna filed a Rule 12(b)(6) motion to dismiss Carrier's complaint. At that time, the district court determined that the issue was the validity and enforceability of the Assignment Agreement between Linde and Carrier. On January 10, 1991, Linde and Lackawanna's motion to dismiss Carrier's complaint was denied. The district court rejected Linde's argument that Carrier was precluded from enforcing the assignment because it had failed to appeal the initial district court decision.
 
 II.
 
 20
 We note at the outset that the appointment of a receiver of a debtor's property by a federal court, confers upon the court federal jurisdiction to decide all questions incident to the preservation, collection and distribution of assets whether such questions are raised in the original suit or ancillary proceedings. Riehle v. Margolies, 279 U.S. 218, 223, 49 S.Ct. 310, 312, 73 L.Ed. 669 (1929). Therefore, it is proper for the district court in carrying out the sale of the foreclosed upon properties to convey the property in accordance with the agreement of sale and any relevant agreements pursuant thereto. Consequently, Carrier's motion to have the property conveyed to itself was a proper, albeit unorthodox, vehicle for a determination of to whom the property was properly conveyed.
 
 Linde's Position on this Appeal
 
 21
 Before we discuss the jurisdictional implications of Carrier's failure to appeal the district court's January 24, 1989 order, we are compelled to comment on Linde's dramatic change in posture throughout this protracted effort to dispose of the Raymond Colliery properties. When we heard argument on Linde's appeal on July 10, 1989, Linde led this court[8] to believe that he and Carrier had a firm agreement and that the assignment was valid. This impression was reinforced when he yielded three minutes of his argument time to Carrier to allow Carrier to present its argument in favor of reversing the district court's order. Yet, when we reversed the district court's decree and validated the position that both Linde and Carrier had taken before this Court, Linde changed his stance and represented that he had believed all along that the assignment was invalid because Carrier did not file a formal appeal of the district court's order.
 
 
 22
 While we will refrain from making a moral judgment on this tactical approach, at a minimum we must convey our incredulity that, during the original oral argument, Linde was arguing solely for enforcement of the Receiver's agreement and not also for the validity of the assignment to Carrier. We consider Linde to have been less than forthright in attempting to deny that, at the time of the original appeal, both parties supported reversal of the district court's invalidation of the sale because of the assignment. Carrier probably was mistaken to have assumed that Linde would always have Carrier's best interests at heart. But it was not unreasonable for Carrier to assume that it was impossible for Linde to appeal only the invalidation of the Agreement of Sale without reaching the question of the assignment--the issue of whether the district court had a valid reason for disapproving the Assignment was always present.
 
 
 23
 We also do not consider Carrier's participation in the second judicial sale to be of any consequence to the question of whether the assignment was invalidated by Carrier's failure to appeal. Carrier's participation in the second Judicial Sale may have indicated to the district court that Linde and Carrier were now competitors rather than partners. Carrier was simply playing both sides of the net in order to ensure that whatever the outcome of Linde's appeal, it was certain to get the property. In fact, Carrier was better off if Linde lost the appeal. As a result of its bid at the second Judicial Sale, Carrier would have gotten the property for $1,631,000. Under the original assignment agreement the property would cost Carrier approximately, $1,757,000. (Carrier's accepted bid of $1,631,300.00 plus the assignment payment of $200,000.00 plus the Marvine Bank # 6 Tract valued at $74,000.00). Linde's argument that Carrier's action in participating at the second Judicial Sale served as some kind of express or implied repudiation of the Assignment is without merit.[9]
 
 Effect of Carrier's Failure to Appeal
 
 24
 The sole question presented is the effect, if any, that Carrier's failure to file a notice of appeal as to the district court's disapproval of the assignment has on that court's ability to now enforce the assignment. Linde appealed the district court's invalidation of the sale on the basis of the assignment. We decided that the invalidation of the sale on the basis of the assignment was improper and that the property should be conveyed according to the Agreement of Sale which called for conveyance to Scott F. Linde or his assigns. United States v. Tabor Court Realty, et al., Nos. 89-5157 & 89-5198, slip op. (3d Cir. Oct. 12, 1989) [888 F.2d 1383 (table) ]. Because the question has continued to be the subject of some confusion we will clarify for the parties and for the court below, the effect that Carrier's failure to appeal had on our prior disposition of the case.
 
 
 25
 As a general rule, a party aggrieved by a decision of the district court must file an appeal in order to receive relief from the decision. United States v. Hickey, 84 U.S. (17 Wall.) 9, 13, 21 L.Ed. 559 (1872). As a result, an appellee who has not filed a cross-appeal may not "attack the decree with a view either to enlarging his own rights thereunder or of lessening the rights of his adversary", Morley Constr. Co. v. Maryland Casualty Co., 300 U.S. 185, 191, 57 S.Ct. 325, 328, 81 L.Ed. 593 (1937), reh. den. 300 U.S. 687, 57 S.Ct. 505, 81 L.Ed. 888 (1937) (quoting United States of America v. American Railway Express Co., 265 U.S. 425, 435, 44 S.Ct. 560, 564, 68 L.Ed. 1087 (1924)). This rule, however, is one of practice generally followed and not a restriction on the power of the courts to see that justice is done. Langnes v. Green, 282 U.S. 531, 538, 51 S.Ct. 243, 246, 75 L.Ed. 520 (1931). Although a timely, initial notice of appeal is mandatory and jurisdictional,[10] it has been the rule of this Circuit that Rule 4(a)(3), which provides additional time for filing cross or other separate appeals, is not a jurisdictional prerequisite. Rather it is a rule of practice which may be waived in the interest of justice under appropriate circumstances. Scott v. Univ. of Delaware, 601 F.2d 76, 82-84 (3d Cir.1979); Finkielstain v. Seidel, 857 F.2d 893, 895 (2d Cir.1988); Hysell v. Iowa Public Service Co., 559 F.2d 468, 476 (8th Cir.1977); Rhoads v. Ford Motor Co., 514 F.2d 931, 934 (3d Cir.1975). In Young Radiator Co. v. Celotex Corp., 881 F.2d 1408, 1415-16 (7th Cir.1989), the Seventh Circuit noted that there has been some disagreement, although not across clear or consistent boundaries, between the circuits as to whether the Rule is jurisdictional or a rule of practice. Whether the Rule is a mandatory one of jurisdiction or a rule of practice is
 
 
 26
 clearly not required by the provision of Article III or § 1291 ... since both these provisions, as interpreted, deal with whole cases.... The relevant statute [28 U.S.C. § 2106] permits the courts of appeals to 'affirm, modify, vacate, set aside or reverse any judgment, decree, or order of a court lawfully brought before it for review.' Thus the rule that a party who did not file a notice of appeal may not ride in on a reversal or modification obtained by another party is a judicial gloss on both the rules and the statute to the effect that the rules require each party to file a notice of appeal, and therefore not the whole 'judgment, decree, or order' but only so much of it as affects the party appealing is 'lawfully brought before [the court of appeals] for review.' 9 J. Moore & B. Ward, MOORE'S FEDERAL PRACTICE p 204.11 at 59 (2d ed. 1991).
 
 
 27
 Linde argues that the Supreme Court's treatment of a related issue in Torres v. Oakland Scavenger Co., 487 U.S. 312, 108 S.Ct. 2405, 101 L.Ed.2d 285 (1988) indicates that Rule 4(a)(3) should also be applied as a jurisdictional requirement. At least two courts have concluded that Torres controls the issue of whether Rule 4(a)(3) is mandatory or waivable. See Stockstill v. Petty Ray Geophysical, 888 F.2d 1493, 1496 (5th Cir.1989) (jurisdiction to review appeal by defendant who failed to file cross appeal from dismissal of claims against third party defendant doubtful in light of Torres ); Young Radiator Co. v. Celotex Corp., 881 F.2d at 1416 (Torres controls the issue of whether defendant should be barred from challenging judgment entered for third party defendants where no cross-appeal taken).
 
 
 28
 In Torres, the Supreme Court granted certiorari to resolve a conflict between the circuits over whether the failure to file a notice of appeal in accordance with the specificity requirement of the Federal Rule of Appellate Procedure 3(c) presented a jurisdictional bar to the appeal. In an opinion by Justice Marshall, the Court held that the omission of one litigant's name, due to a clerical error, in a notice of appeal filed by fifteen other intervenors in an employment discrimination suit constituted a failure of that party to appeal. In so holding, the Court expressed the belief that "the mandatory nature of the time limits contained in Rule 4 would be vitiated if courts of appeals were permitted to exercise jurisdiction over parties not named in the notice of appeal." Torres, 108 S.Ct. at 2408. The Court was influenced to some extent by the Advisory Committee Note following Rule 3 which states:
 
 
 29
 Rule 3 and Rule 4 combine to require that a notice of appeal be filed with the clerk of the district court within the time prescribed for taking an appeal. Because the timely filing of a notice of appeal is 'mandatory and jurisdictional,' [citation omitted] compliance with the provisions of those rules is of the utmost importance. 28 U.S.C.App., p. 467. Torres, 108 S.Ct. at 2408.
 
 
 30
 Although the Court acknowledged that a court may construe the rules liberally in determining whether they have been complied with, it emphasized nonetheless that a court "may not waive the jurisdictional requirements of Rules 3 and 4." Torres, 108 S.Ct. at 2409.
 
 
 31
 We are not of the opinion that Torres controls the issue in this case. The Supreme Court's discussion does not present any definitive statement as to whether or not a cross-appeal is mandatory or jurisdictional. The opinion certainly indicates that the Supreme Court intended to streamline compliance with initial notice of appeal specificity requirements. Although the opinion contains seemingly broad language discussing the jurisdictional aspects of Rule 3 or 4, neither the language nor the decision goes beyond a clarification of the point at which non-compliance with the Rules' requirements goes impermissibly beyond that allowed by even a liberal construction of the rules.
 
 
 32
 But although a court may construe the rules liberally in determining whether they have been complied with, it may not waive the jurisdictional requirements of Rules 3 and 4, even for "good cause shown" under Rule 2, if it finds that they have not been met.
 
 
 33
 Torres, 108 S.Ct. at 2409. Therefore, we conclude that the Court's reference to the jurisdictional aspects of Rules 3 and 4 does not indicate that Rule 4(a)(3) is not properly applied as a rule of practice.
 
 
 34
 The fact is that the presence or lack of a formal cross-appeal will not always determine a court's ability to consider certain issues that are raised by parties to the appeal but also pertain to parties who are not formally participating in the appeal. Indeed, in some cases, the rights of the parties are so closely tied together that an appellate court can render no judgment that would be just without affecting the rights of parties who did not file notices of appeal. See Hysell v. Iowa Public Service Company, 559 F.2d 468, 476 (8th Cir.1977); Arnold's Hofbrau, Inc. v. George Hyman Construction Co., 480 F.2d 1145, 1150 (D.C.Cir.1973); 9 J. Moore & B. Ward, MOORE'S FEDERAL PRACTICE, p 204.11 at 59-66 (2d ed. 1991); see also Young Radiator v. Celotex, 881 F.2d at 1415 (surmising that in those Circuits which have held that Rule 4(a)(3) is a rule of practice, "the basic rationale is that the initial notice of appeal invokes jurisdiction over the whole case so that the appellate court has the power to overlook the absence of a Rule 4(a)(3) notice and to reverse or otherwise modify a non-appealed judgment or ruling in order to fully adjudicate the appeal before it"). At the very least, in such cases there can be no question that the initial notice of appeal invokes jurisdiction over the whole case. In order to fully adjudicate the appeal before it, an appellate court will necessarily have the power to overlook the absence of a 4(a)(3) notice and to reverse or otherwise modify a non-appealed judgment or ruling. See Langnes v. Green, 282 U.S. at 538, 51 S.Ct. at 246. In light of this distinction, the Torres holding is not readily transferrable to the question of whether or not Rule 4(a)(3) is jurisdictional or a rule of practice.
 
 
 35
 The case at hand presents just such a case where the disposition as to one party is inextricably intertwined with the interests of a non-appealing party so as to make it impossible to grant relief to one party without granting relief to the other. Linde contends that because Carrier did not file a separate appeal, the issue particular to Carrier at the time of the appeal (the correctness of the district court's invalidation of the assignment) was not before this court. According to this argument, the district court's explicit disapproval of the assignment still stands despite our decision that the first public sale was improperly voided. However, this argument ignores the fact that the relief we granted to Linde (the reinstatement of the sale) was premised on the fact that the assignment to Carrier was an improper basis upon which to void the sale. The validity of the assignment was indirectly considered in terms of whether it was proper to disapprove the sales agreement on the grounds that the assignment improperly stifled competitive bidding. We decided that absent collusion there was no reason to disapprove the sales agreement on the basis of the assignment:
 
 
 36
 We conclude that unless there was collusion, fraud, unfairness or mistake in the conduct of sale, or the price brought at the sale was so grossly inadequate as to shock the conscience of the court and raise a presumption of fraud, unfairness or mistake, that neither inadequacy of the purchase price nor the assignment is sufficient reason for the district court to set aside the assignment or to refuse final court approval of the sale.
 
 
 37
 Tabor Court Realty, slip op. at 3. Therefore, the only conclusion to be drawn from our earlier opinion is that the assignment to Carrier was still enforceable absent a showing of collusion.[11]
 
 
 38
 The case of In re Barnett, 124 F.2d 1005 (2d Cir.1942) involves facts sufficiently analogous to this case which illustrate the difficulty of applying the cross-appeal rule as a jurisdictional requirement. In that case, a daughter had assigned her interest in her father's estate to her mother. When the daughter subsequently filed for bankruptcy, the trustee in bankruptcy petitioned for an order directing the daughter to assign her interest in the estate to the trustee. The daughter and her mother contested the petition in district court and lost. The daughter appealed the district court's decision but the mother and the executor did not file an appeal. The Court of Appeals reversed holding that the assignment to the mother was valid. The court found that the mother, as one of the parties below, and as the party for whose benefit the assignment was made, had obviously assumed that her rights would be brought before the court of appeals pursuant to the daughter's appeal and that a reversal of the district court's order would mean a reversal as to her.
 
 
 39
 As previously observed, the other parties adversely affected by the lower court's order did not pray an appeal. Had they done so, it is clear, from our opinion, that we would have held the order erroneous as to them. We are clear that we have the power to order a reversal as to them even though they did not appeal and that we should do so under the circumstances here disclosed. The anomalous position of the parties otherwise, and the quite naturally embarrassing questions which would confront the state court if the order, stigmatized by us as erroneous, remains partially in effect, are patent.
 
 
 40
 Barnett, 124 F.2d at 1008-09. The court concluded that it was proper to render judgment as to the mother and the executor because to do otherwise would frustrate the relief afforded by the decision--"where reversal of the judgment wipe[d] out all basis for recovery against a non-appealing, as well as against an appealing defendant, the reversal may operate to the benefit of both." Id.
 
 
 41
 The Second Circuit's reasoning in Barnett applies squarely to this case. When Linde argued for the reversal of the district court's invalidation of the first public sale, all parties, including the Court itself, assumed that Carrier's rights were being adjudicated during the Linde appeal. Our reversal as to the district court's order operated to both Linde and Carrier's benefit. Had Carrier filed an appeal, the outcome would not have been different.
 
 III.
 
 42
 We conclude that the district court was bound by the terms of the agreement to convey the property to Scott Linde or his lawful assigns. Once a party holding a valid Assignment presented itself to the district court as the lawful assign, then the district court had no choice but to convey to that party.
 
 
 43
 Based on conflicting interpretations of a provision within the assignment agreement, Linde now argues that the lawful assign is Lackawanna Energy while Carrier claims that it is the lawful assign. Although both parties request us to decide the correct interpretation of the Assignment agreement, we decline to do so. In light of the odd posture of this case, where there is presently pending an action for specific performance which raises the same question the parties urge us to decide here, we will not infringe upon the district court's right to resolve this issue in conjunction with the instant opinion. Therefore, we will remand the action and order the district court to vacate its January 24, 1989 order and recommend that the court consolidate this case (Civil Action 80-1424) with Civil Action 90-1731 and render final decision on the case as a whole.
 
 
 
 [1]
 The parcels of land encompass approximately 652 acres and were encumbered with mine refuse banks that are subject to term leases and term deeds held by Carrier Coal Enterprises
 
 
 [2]
 This parcel of land is known as the Marvine Bank # 6 tract
 
 
 [3]
 The written agreement between the parties provided that Kluger and Ufberg were to serve as escrow agents. The agreement also provided that, upon approval of the sale, Linde would be entitled to the interest accrued on the $200,000
 
 
 [4]
 According to Carrier, it was unclear as to whether a written bid made prior to 10 a.m. or an oral bid made after 10 a.m. would determine the outcome. (App. at 403)
 
 
 [5]
 THE COURT: Proceed
 MR. VANASKIE: Thank you, Your Honor. In addition, I should note I have ceded three minutes of my time to counsel for Carrier Coal, though an Appellee, has joined in our brief.
 (App. at 437).
 
 
 [6]
 Technically, Carrier had no standing since it was not an appellant in the case. Its appearance status at oral argument was more as an amicus rather than as an appellant of record
 
 
 [7]
 On November 5, 1990, the district court denied Carrier's motion to stay the conveyance to Linde pending the appeal
 
 
 [8]
 That panel was identical to the panel in this case--J. Becker, J. Nygaard, and J. Higginbotham
 
 
 [9]
 Linde also argued in its brief that the return of the escrowed $200,000 cash consideration meant that Carrier had waived its right to the assignment. At oral argument, however, counsel for Linde conceded that this argument was a non-issue. See Oral Arg. Trscrpt. at 31. Having reviewed this argument in full, with the aid of supplemental briefing by the parties, we conclude that this question is indeed a "non-issue."
 
 
 [10]
 In Young Radiator Co. v. Celotex Corp., 881 F.2d 1408, 1415 (7th Cir.1989), the court observed that Fed.R.App.P. 1(b) provides that the Federal Rules of Appellate Procedure "shall not be construed to extend or limit the jurisdiction of the courts of appeals as established by law."
 Thus, the rules of appellate procedure do not, in a strict sense affect the subject matter jurisdiction of the courts of appeals.
 However, the rules of appellate procedure have the force of law, 28 U.S.C. § 2072, and Rules 3 and 4 state conditions precedent for the exercise of the appellate jurisdiction granted by Article III and 28 U.S.C. § 1291. Although these conditions precedent are spoken of as 'mandatory and jurisdictional,' see e.g., Browder v. Director, Dept. of Corrections, 434 U.S. 257, 264, 98 S.Ct. 556, 561 [54 L.Ed.2d 521] (1978), the more precise effect of the rules is to state conditions which invoke the jurisdiction of the court. Sanchez v. Board of Regents, 625 F.2d 521, 522 n. 1 (5th Cir.1980); see also 9 J. Moore & B. Ward, MOORE'S FEDERAL PRACTICE pp 204.02 at 4-14, 204.11 at 4-59 (2d ed. 1991).
 
 
 [11]
 In order to understand this question better, it is helpful to consider what would have occurred on remand had collusion been found. If there had been collusion, the agreement of sale would have been invalid--thus the assignment would have been invalid also. In the absence of collusion, the only conclusion that the district court could reach was that the Agreement of Sale, with its assignment provision, was valid