22 F.3d 1274
 62 USLW 2733, Fed. Sec. L. Rep. P 98,184,
28 Fed.R.Serv.3d 1333
 Scott GARR; Patricia Garr, on behalf of themselves and all
others similarly situated
v.
U.S. HEALTHCARE, INC., Leonard Abramson, Arnold Levin,
Esquire, in his own right and Harris Sklar,
Esquire, in his own right, Appellants.
 No. 93-1754.
 United States Court of Appeals,
Third Circuit.
 Argued March 10, 1994.
Decided April 29, 1994.
Sur Petition for Rehearing June 29, 1994.
 
 Arnold Levin, Fred S. Longer, Levin, Fishbein, Sedran & Berman, Philadelphia, PA, Geoffrey C. Hazard, Jr. (argued), New Haven, CT, for appellants.
 Alan J. Davis (argued), Carl W. Hittinger, Leslie H. Smith, Martin C. Bryce, Jr., Ballard Spahr Andrews & Ingersoll, Philadelphia, PA, David F. Simon, U.S. Healthcare, Inc., Blue Bell, PA, for appellees.
 Before: GREENBERG, ROTH, and ROSENN, Circuit Judges.
 OPINION OF THE COURT
 GREENBERG, Circuit Judge.
 
 I. INTRODUCTION
 
 1
 This matter is before the court on an appeal from orders of the district court entered on February 5, 1993, and July 6, 1993, imposing sanctions on appellants Arnold Levin and Harris J. Sklar pursuant to Fed.R.Civ.P. 11. We will set forth the background of this case in detail as the issues should be considered in the context of both this case and the related litigation we will describe. The district court's opinion concluding that there had been Rule 11 violations is published as Greenfield v. U.S. Healthcare, Inc., 146 F.R.D. 118 (E.D.Pa.1993), and its subsequent opinion fixing the amount of the sanctions is dated July 6, 1993. Greenfield v. U.S. Healthcare, Inc., No. 92-6345, 1993 WL 257315 (E.D.Pa. July 6, 1993).
 
 
 2
 This action arose in the aftermath of an article in the Wall Street Journal published on November 4, 1992, entitled "U.S. Healthcare Insiders Sold Stock Before Last Week's 17% Price Decline." The article recited that U.S. Healthcare, Inc. insiders, including Leonard Abramson, its chairman and president, had been heavy sellers of its stock before a 17% two-day drop in its price in the week before publication of the article. The article indicated the drop had been precipitated by disappointing earnings.
 
 
 3
 James R. Malone, Jr., a member of the Haverford, Pennsylvania, law firm of Greenfield & Chimicles, who read the article on the morning it was published, was interested in its contents because his firm specialized in securities litigation. Indeed, in an extraordinary allegation, not denied by Malone, U.S. Healthcare in the Rule 11 proceedings charged that Greenfield & Chimicles maintained a list of corporate stockholders available to become plaintiffs in securities litigation.[1] Robert K. Greenfield was on that list.[2] It is undisputed that after Malone read the article he examined a "representative sampling of stories relating to U.S. Healthcare," as well as a report on background information on the company. He also obtained considerable other information about U.S. Healthcare, including filings it had made with the Securities and Exchange Commission.
 
 
 4
 Malone does not contend that at the time that he was doing this research he had a client who had expressed any interest in the article to him. Rather, Malone was seeking to generate a lawsuit. Thus, in the pithy words of the district court, "[h]aving a case but no client," he called Greenfield who lives in Florida to discuss the U.S. Healthcare situation. Malone described the Wall Street Journal article to Greenfield and established that he owned stock in U.S. Healthcare. Malone asked Greenfield whether he would like Greenfield & Chimicles to file a suit on his behalf if the firm believed that there had been actionable wrongdoing, and Greenfield answered affirmatively. Within hours Malone determined that a certain class of U.S. Healthcare stockholders had "a legitimate and cognizable legal claim" stemming in part from the insiders' stock sales.
 
 
 5
 Events continued to unfold rapidly on November 4, 1992, for on that day Malone prepared and filed a class action complaint on behalf of Greenfield under section 10(b) of the Securities Exchange Act of 1934. 15 U.S.C. Sec. 78j(b). The gravamen of the complaint was that U.S. Healthcare and Abramson had issued false and misleading statements which were filed with the Securities and Exchange Commission and which caused Greenfield and the stockholder class to purchase U.S. Healthcare stock at artificially inflated prices. The complaint asserted controlling person liability against Abramson under section 20 of the Securities Exchange Act. 15 U.S.C. Sec. 78t. In the complaint, Malone recited that Greenfield fairly and adequately could represent the interest of the class of stockholders on whose behalf the action was being brought. Inasmuch as Malone mailed the complaint to Greenfield on November 4, 1992, Malone filed it before Greenfield received it. Obviously Malone did not think it important for Greenfield to see the complaint before it was filed even though Malone regards Greenfield as a distinguished retired corporate attorney.
 
 
 6
 On November 5, 1992, Malone on behalf of Allen Strunk filed a second class action against U.S. Healthcare and Abramson. The Strunk action repeated the allegations word for word from the Greenfield case except that the name of the plaintiff and the number of shares he owned were changed. Malone filed this action after Fred Taylor Isquith, an attorney in New York, contacted him and asked him to represent Strunk.
 
 
 7
 Malone and Strunk's New York lawyers were not the only attorneys interested in the U.S. Healthcare situation. On November 4, 1992, appellant Arnold Levin of the Philadelphia firm of Levin, Fishbein, Sedran & Berman, also read the Wall Street Journal article. Levin and his firm have what he characterized as "a long-standing professional relationship" with Greenfield & Chimicles, and Levin had a high regard for Greenfield & Chimicles' ethical standards and skill in handling federal securities law suits. On November 4, 1992, after Levin had read the article, Malone called him to discuss the merits of bringing a section 10(b) action against U.S. Healthcare and Abramson. Malone mentioned the Wall Street Journal article, and said he had done research into whether a section 10(b) action could be brought. Malone also told Levin that he had prepared such a complaint. Levin requested that Malone fax him a copy of the complaint, and Malone promptly did so. Levin then read the Greenfield complaint and reread the Wall Street Journal article and concluded, as he set forth in his affidavit, that "[b]ased upon my experience and understanding from the two documents," and in "reliance on the integrity of the pre-filing investigation of Greenfield & Chimicles," the section 10(b) action had merit.
 
 
 8
 There was even more interest in the U.S. Healthcare situation for on November 4, 1992, appellant Harris J. Sklar, a Philadelphia attorney in individual practice, also read the article. According to his affidavit, Sklar discussed the possibility of bringing an action against U.S. Healthcare with his client Scott Garr who was a U.S. Healthcare stockholder, and Garr authorized Sklar to bring the case on a class action basis. Sklar, however, saw the need to obtain co-counsel and consequently called Levin, as he had worked with him in the past. Levin then told Sklar of his dealings with Malone, and Levin and Sklar discussed the possibility of a suit. Sklar asked Levin to fax him a copy of the Greenfield complaint and Levin did so. Sklar then reviewed the complaint and, in his words as set forth in his affidavit, "[b]ased on my understanding of the securities laws and the facts as described in the Wall Street Journal," he determined that the complaint had merit. Sklar thus again spoke to Levin and indicated that Levin could file the class action on behalf of Scott Garr and Patricia Garr, his wife. On November 6, 1992, Levin and Sklar filed that complaint which replicated the Greenfield and Strunk complaints except that the names of the plaintiffs and the number of shares they owned were changed.[3]
 
 
 9
 There was now an extraordinary development. On November 6, 1992, the same day that Levin and Sklar filed the Garr complaint, U.S. Healthcare and Abramson moved in the district court for the imposition of sanctions pursuant to Rule 11 in the Greenfield, Strunk, and Garr actions. This motion was a formidable document, as with attachments it exceeded 100 pages. At oral argument we asked U.S. Healthcare's attorney, Alan J. Davis, how it was possible that he filed this motion on the same day the Garr complaint was filed. He explained that he had anticipated that following the filing of the Greenfield complaint there would be additional complaints and accordingly his firm had a person waiting in the clerk's office to obtain copies of them when they were filed.[4] He further explained that in class actions additional complaints are generated so that the original attorney will have allies when a vote is taken to determine the lead attorney. The lead attorney position is coveted as it is likely to bring its occupant the largest share of the fees generated by the litigation.
 
 
 10
 In their brief, U.S. Healthcare and Abramson explained the basis for the motion in detail. They asserted that Malone, Levin, and Sklar failed to conduct "even the most cursory factual and legal investigation" of the case and that if they had done so they would have determined that the complaints had no basis in fact or law. The brief indicated that the three complaints demonstrated the "all too familiar pattern of an instant class action lawsuit based on newspaper reports followed by a covey of cut and paste copycat complaints."
 
 
 11
 As if what we have described is not remarkable enough, there was yet an additional extraordinary development in the Greenfield case. On November 8, 1992, Robert K. Greenfield finally read the complaint, and at that time came to the realization that he had made a mistake in bringing the action because he knew of no basis for it and because his son had substantial business dealings with U.S. Healthcare. Thus, he directed Malone to withdraw the complaint. When U.S. Healthcare and Abramson learned of Robert K. Greenfield's position, they supplemented their motion for Rule 11 sanctions to assert that Malone had failed to make a reasonable inquiry into whether Greenfield fairly and adequately could protect the interests of the plaintiff class.
 
 
 12
 Malone filed a declaration in opposition to the Rule 11 motion.[5] On December 10, 1992, the district court held an evidentiary hearing on the motion at which Greenfield testified. On December 15, 1992, the court entered an order directing Malone, Isquith, Levin, and Sklar to submit documentation that each "conducted a reasonable pre-filing inquiry into the facts and law" supporting the actions.
 
 
 13
 Thereafter, the district court filed its reported opinion of February 4, 1993. After setting forth the background of the case at length, the court found that Malone could not be sanctioned under Rule 11 with respect to the accuracy of the information on which he had predicated the Greenfield complaint because his inquiry into the underlying facts "was reasonable under the circumstances." 146 F.R.D. at 125. However, the court found that Malone had violated Rule 11 with respect to the allegation in the complaint that Greenfield fairly and adequately could protect the interests of the class. 146 F.R.D. at 125-26. But it also found that it could not say that Malone had made an inadequate inquiry into Strunk's ability fairly and adequately to protect the class. Accordingly, as Malone's factual inquiry into the merits of the case against U.S. Healthcare and Abramson had been reasonable, the court did not impose sanctions in the Strunk action.
 
 
 14
 The district court next discussed whether sanctions should be imposed on Levin and Sklar. In this regard the court pointed out that Levin cited our opinion in Lewis v. Curtis, 671 F.2d 779 (3d Cir.), cert. denied, 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 144 (1982), in which we indicated that reliance on an article in the Wall Street Journal is not based "on an insubstantial or meaningless investigation" and that plaintiffs and their attorneys "need not make further expenditures to prove independently that which may be read with some confidence of truthfulness and accuracy in a respected financial journal." The court observed that Lewis was decided under Fed.R.Civ.P. 23.1 and that we have never applied that case under Rule 11. It then held that Rule 11 imposes a "non-delegable duty upon the signing attorney to conduct his own independent analysis of the facts and law which form the basis of a pleading or motion," citing Pavelic & LeFlore Marvel Entertainment Group, 493 U.S. 120, 125-27, 110 S.Ct. 456, 459-60, 107 L.Ed.2d 438 (1989). The court rejected Levin's argument that he could rely on the integrity of the investigation by Greenfield & Chimicles, and it therefore ruled that Sklar could not rely on that investigation either. Ultimately the court held "that Levin and Sklar sought to act more quickly than fulfilling their duty would have allowed" and that "Levin['s] and Sklar's inquiry, or lack thereof, was unreasonable under the circumstances and a violation of Rule 11." 146 F.R.D. at 122-28.
 
 
 15
 The court provided for the following sanctions. It required that Malone, Levin, and Sklar pay all of U.S. Healthcare's and Abramson's reasonable costs and attorney's fees incurred to that time, that the Greenfield and Garr complaints be dismissed without prejudice, and that the matter be referred to the Disciplinary Board of the Supreme Court of Pennsylvania for an investigation into whether the conduct of Malone, Levin, and Sklar constituted a violation of the Pennsylvania Rules of Professional Conduct. It directed the attorneys for U.S. Healthcare and Abramson to file an affidavit setting forth their costs and attorneys' fees. Of course, the court did not dismiss the Strunk action as there had been no Rule 11 violation in that case. Nevertheless, that case was dismissed without prejudice by stipulation on February 23, 1993. At oral argument, we were advised that none of the dismissed actions have been reinstituted. Thus, since February 23, 1993, there has been no merits litigation in any of the cases in the district court. The Rule 11 proceedings were completed on July 6, 1993, when, following its receipt of affidavits of costs and attorney's fees, the district court entered a memorandum opinion and order requiring Malone, Levin, and Sklar respectively to pay sanctions of $24,697.50, $1,428.00, and $1,428.00. Malone paid his sanction and did not thereafter appeal, but Levin and Sklar obtained stays and have appealed.
 
 II. DISCUSSION
 
 16
 Insofar as significant here, Rule 11 provides that:
 
 
 17
 The signature of an attorney or party constitutes a certificate by the signer that the signer has read the pleading, motion, or other paper; that to the best of the signer's knowledge, information and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal or existing law, and that it is not interposed for any improper purpose, such as to harass or cause unnecessary delay or needless increase in the cost of litigation.[6]
 
 
 18
 The signer's signature on a pleading, motion, or other paper certifies the signer has done three things: (1) read the pleading, motion, or paper; (2) made a reasonable inquiry into the contents of the pleading, motion, or other paper and concluded that it is well grounded in fact and warranted in law; and (3) has not acted in bad faith in signing the document. See CTC Imports and Exports v. Nigerian Petroleum Corp., 951 F.2d 573, 578 (3d Cir.1991). The court determines the reasonableness of an inquiry by applying an objective standard. See Business Guides, Inc. v. Chromatic Communications Enters., Inc., 498 U.S. 533, 548-50, 111 S.Ct. 922, 932-33, 112 L.Ed.2d 1140 (1991); Bradgate Assocs., Inc. v. Fellows, Read & Assocs., 999 F.2d 745, 752 (3d Cir.1993). It is clear that the signer has a "personal, nondelegable responsibility" to comply with the requirements of Rule 11 before signing the document. Pavelic & LeFlore v. Marvel Entertainment Group, 493 U.S. at 127, 110 S.Ct. at 460. See In re Mitchell, 901 F.2d 1179, 1188 & n. 23 (3d Cir.1990).
 
 
 19
 A signer's obligation personally to comply with the requirements of Rule 11 clearly does not preclude the signer from any reliance on information from other persons. For example, no one could argue fairly that it would be unreasonable for an attorney to rely on witnesses to an accident before bringing a personal injury action. After all, the accident hardly can be reconstructed for the benefit of a plaintiff's attorney. Similarly, an attorney is not always foreclosed from relying on information from other persons. Thus, in CTC Imports and Exports, we stated that a determination of whether there has been " 'a reasonable inquiry may depend on ... whether [the signer] depended on forwarding counsel or another member of the bar.' " 951 F.2d at 578 (quoting Notes of Advisory Committee on Rules, 1983 Amendment, Fed.R.Civ.P. 11, reprinted at 97 F.R.D. 165, 199). Furthermore, as we recognized in CTC Imports and Exports, inasmuch as the standard under Rule 11 is "fact specific," the court must consider all the material circumstances in evaluating the signer's conduct. 951 F.2d at 578.
 
 
 20
 It is also important to observe that when the court examines the sufficiency of the inquiry into the facts and law, it must avoid drawing on the wisdom of hindsight and should test the signer's conduct by determining what was reasonable when the document was submitted. Bradgate Assocs., 999 F.2d at 752; CTC Imports and Exports, 951 F.2d at 578. Thus, if under an objective standard, the signer made a reasonable inquiry both as to the fact and the law at the time a document was submitted, subsequent developments showing that the signer's position was incorrect will not subject the signer to Rule 11 sanctions for having submitted the document. On the other hand, a signer making an inadequate inquiry into the sufficiency of the facts and law underlying a document will not be saved from a Rule 11 sanction by the stroke of luck that the document happened to be justified. As the court indicated in Vista Mfg., Inc. v. Trac-4 Inc., 131 F.R.D. 134, 138 (N.D.Ind.1990), "A shot in the dark is a sanctionable event, even if it somehow hits the mark." The court in Vista correctly stated the law, for if a lucky shot could save the signer from sanctions, the purpose of Rule 11 "to deter baseless filings" would be frustrated. Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 393, 110 S.Ct. 2447, 2454, 110 L.Ed.2d 359 (1990).
 
 
 21
 There is also a temporal element in a determination of whether an inquiry was reasonable. Thus, we have recognized that a factor in ascertaining the reasonableness of the signer's inquiry is the amount of time available to investigate the facts and law involved. Bradgate Assocs., 999 F.2d at 752; CTC Imports and Exports, 951 F.2d at 578. Accordingly, if a client comes into an attorney's office for an initial consultation concerning a possible case one day before the statute of limitations will run, the attorney might be justified in filing a complaint predicated on an inquiry which would be inadequate if the attorney had more time for investigation. On the other hand, an attorney with a great deal of time to file a document might be expected to make a more comprehensive inquiry than an attorney working under severe time constraints.
 
 
 22
 In reviewing a district court's Rule 11 determination, we use the abuse of discretion standard. Cooter & Gell v. Hartmarx Corp., 496 U.S. at 405, 110 S.Ct. at 2461. See also Lony v. E.I. DuPont de Nemours & Co., 935 F.2d 604, 615 (3d Cir.1991). However, this standard may incorporate other standards of review, for the Supreme Court has indicated that a district court "would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." Cooter & Gell v. Hartmarx Corp., 496 U.S. at 405, 110 S.Ct. at 2461.
 
 
 23
 Application of the foregoing principles requires us to affirm. We, of course, are exercising the abuse of discretion standard, for this is not a case in which the historical facts underlying the court's determination are in dispute. As Levin and Sklar explain in their brief: "Here, Levin acquired the knowledge from one whom he knew to be competent securities law counsel, Malone, coupled with the knowledge Levin obtained from the Wall Street Journal, and his experienced understanding of the securities laws. [sic] Levin passed this information on to Sklar so that he too could make the same certification." Brief at 17.
 
 
 24
 We do not doubt that sometimes it is difficult to reconcile the tension between the requirement that a signer personally discharge the Rule 11 obligations and the acknowledgement that a signer may rely on another party's inquiry in some cases. But this appeal presents no difficulties. Malone's declaration described the scope of his inquiry in great detail. He obtained a representative sampling of stories regarding U.S. Healthcare and a "disclo" report giving a great deal of financial information regarding U.S. Healthcare, including five-year figures showing sales, net income, earnings per share, and growth rate. He also considered financial ratios and examined forms filed with the Securities and Exchange Commission showing trading in U.S. Healthcare stock by insiders. In fact, in the district court's view, Malone's inquiry was inadequate only as to Greenfield's status as the class representative.[7]
 
 
 25
 On the other hand, Levin and Sklar relied only on the Wall Street Journal article, the Greenfield complaint, and Malone. They made no effort to examine the numerous materials Malone assembled, and they cannot justify their failure to have done so. They do not contend that Malone would not at their request have sent the materials to them. Alternatively, we see no reason why they could not have seen the materials by travelling the short distance from their offices in Philadelphia to Malone's office in Haverford, a Philadelphia suburb. We also point out that the documents on which Malone relied were all accessible to the public so that Levin and Sklar could have obtained them themselves.
 
 
 26
 Furthermore, there were no time constraints requiring Levin and Sklar to file the Garr complaint on an expedited basis. The Wall Street Journal article was published on November 4, 1992, and Levin and Sklar filed the Garr complaint two days later. Levin and Sklar do not contend that they were confronted with a statute of limitations problem compelling immediate action. At oral argument, counsel for U.S. Healthcare and Abramson indicated that in his view the one year/three year limitations rule recognized in Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, ----, 111 S.Ct. 2773, 2782, 115 L.Ed.2d 321 (1991), was applicable. While we neither endorse nor reject that position as it has not been briefed, it is clear that there could not have been a statute of limitations problem, as the Wall Street Journal article described events in the very recent past.
 
 
 27
 We also point out that Levin and Sklar have advanced no other reason why the Garr complaint had to have been filed within two days of the publication of the article. They do not contend, for example, that the Garrs needed emergency relief, nor do they suggest that U.S. Healthcare or Abramson might have evaded process or concealed assets if the suit had not been filed so quickly. While at oral argument the suggestion was made that class actions are brought quickly so that the attorney filing the case may control the litigation, we would not regard that reason as in any way detracting from the reasonable inquiry otherwise required under Rule 11.
 
 
 28
 At bottom, there is no escape from the conclusion that Levin and Sklar abdicated their own responsibilities and relied excessively on Malone contrary to Rule 11. Furthermore, they did not rely on Malone only as to some small portion of the case. Rather, they relied on his inquiry to justify the entire cause of action. Indeed, they filed the complaint Malone had prepared, changing only the name of the plaintiffs and the number of shares owned. We recognize that it could be argued that it would have been pointless for Levin and Sklar to make an inquiry into the merits of the case sufficient to satisfy Rule 11 as Malone already had done so. Yet Rule 11 requires that an attorney signing a pleading must make a reasonable inquiry personally. The advantage of duplicate personal inquiries is manifest: while one attorney might find a complaint well founded in fact and warranted by the law, another, even after examining the materials available to the first attorney, could come to a contrary conclusion. Overall, we conclude that the Rule 11 violation in this case is so clear that even on a plenary review, we would uphold the sanctions imposed on Levin and Sklar. Accordingly, under the deferential abuse of discretion standard, we certainly must affirm the district court's determination that sanctions were required.
 
 
 29
 In reaching our result, we have not overlooked Levin's and Sklar's reliance on Lewis v. Curtis, 671 F.2d 779. Rather, we determine that the case does not help them. In fact, in Lewis v. Curtis we did not discuss or even cite Rule 11. Indeed, insofar as germane here, in Lewis v. Curtis we merely indicated that reliance on an article in the Wall Street Journal is not based "on an insubstantial or meaningless investigation" for purposes of Rule 23.1. 671 F.2d at 788. Rule 23.1, however, deals with the requirement in derivative actions that the plaintiff verify certain allegations of the complaint. But Rule 23.1 has no counterpart to the Rule 11 requirement that a pleading, motion or other paper be signed only after "reasonable inquiry." Thus, an attorney cannot rely on Lewis v. Curtis in determining whether an inquiry is reasonable under Rule 11.
 
 
 30
 There is another reason why Lewis v. Curtis is inapposite and why Levin's and Sklar's reliance on the Wall Street Journal never could have been sufficient in this case. A significant aspect of the Garr complaint was that U.S. Healthcare had been filing false and misleading quarterly reports with the Securities and Exchange Commission to the injury of Garr and the class. Yet inasmuch as the Wall Street Journal article never suggested that U.S. Healthcare had been filing false reports, Levin and Sklar could not reasonably have relied on the article for that information. Indeed, neither Levin nor Sklar even asserts that he ever saw these publicly available reports before they filed the Garr complaint. We are at a total loss to understand how attorneys can urge that they have made a reasonable inquiry into the facts and the law of a case when their complaint is predicated on allegedly false statements in documents which they have not bothered to read.
 
 
 31
 Levin and Sklar seek to avoid sanctions by citing language from our opinions in Doering v. Union County Bd. of Chosen Freeholders, 857 F.2d 191, 194 (3d Cir.1988), and Gaiardo v. Ethyl Corp., 835 F.2d 479, 483 (3d Cir.1987), that Rule 11 should be applied only in "exceptional circumstances" or where the document "is patently unmeritorious or frivolous." But these cases can be of no comfort to Levin and Sklar. As we have made clear, the sanctions in this case were not predicated on a conclusion by the court that the Garr complaint was unmeritorious. The Rule 11 problem is that neither Levin nor Sklar made a reasonable inquiry as required by Rule 11 before signing the complaint. Furthermore, the suggestion that Rule 11 should be used only in "exceptional circumstances" was intended to explain that sanctions were not to be imposed merely because there is a disagreement as to the correct resolution of a matter in litigation. Gaiardo, 835 F.2d at 483.
 
 
 32
 Finally, Levin and Sklar urge that the district court abused its discretion in imposing the monetary sanctions. This contention is frivolous. In fact, the monetary sanction of $1,428 imposed on each reflected great restraint by the district court. Langer v. Monarch Life Ins. Co., 966 F.2d 786, 811 (3d Cir.1992).
 
 III. CONCLUSION
 
 33
 The orders of February 5, 1993, and July 6, 1993, will be affirmed.
 
 ROTH, Circuit Judge, dissenting:
 
 34
 Although I share the majority's view that Levin and Sklar's conduct fell far short of the ideal, I do not share its belief that Rule 11 sanctions are appropriate in this situation. Instead, I believe that, when a court finds that an attorney has filed a meritorious complaint, the court should not go on to inquire whether the attorney conducted an adequate investigation prior to filing the complaint. I therefore respectfully dissent.
 
 
 35
 Except for changes in the named plaintiffs and the number of shares they owned, the complaint filed by Levin and Sklar on behalf of the Garrs was identical to the complaints filed by Malone on behalf of Greenfield and Strunk. As the majority notes, the district court did not dismiss the Strunk complaint, thereby implicitly finding that on its face it stated a valid claim. Presumably, had the district court not determined that Levin and Sklar violated Rule 11, it would not have dismissed the Garr complaint. Thus it is safe to assume that the district court believed that the Garr complaint on its face was meritorious.
 
 
 36
 In holding that the imposition of sanctions was appropriate in this case, the majority relies on the following statement in an opinion from a district court in another circuit: "A shot in the dark is a sanctionable event, even if it somehow hits the mark." Vista Mfg., Inc. v. Trac-4, Inc., 131 F.R.D. 134, 138 (N.D.Ind.1990). Though this statement has the virtue of being colorful, as the basis of the majority's reasoning it suffers from three flaws. First, Vista does not support the majority's position; despite the quoted statement the court imposed no sanctions. Second, in relying on Vista the majority overlooks apparent statements of law to the contrary by the Vista court's own circuit, the Seventh, and by the Second Circuit. Finally, the majority's conclusion that the Vista rule is necessary to further the purposes of Rule 11 is the product of an incomplete analysis of both the policies animating Rule 11 and the impact of that rule on the effectiveness of Rule 11. I shall address these latter two points in turn.
 
 
 37
 The Seventh Circuit, a very aggressive court in terms of enforcing Rule 11, see Lawrence C. Marshall et al., The Use and Impact of Rule 11, 86 Nw.U.L.Rev. 943, 981-82 (1992), observed pre-Vista that for purposes of Rule 11 "[a]n attorney takes a frivolous position if he fails to make a reasonable inquiry into facts (which later prove false ) or takes a position unwarranted by existing law or a good faith argument for its modification." Magnus Elecs. v. Masco Corp. of Indiana, 871 F.2d 626, 629 (7th Cir.) (emphasis added), cert. denied, 493 U.S. 891, 110 S.Ct. 237, 107 L.Ed.2d 188 (1989). See also Rush v. McDonald's Corp., 966 F.2d 1104, 1122 n. 67 (7th Cir.1992).
 
 
 38
 Moreover, in several cases the Second Circuit has suggested that Rule 11 sanctions are inappropriate in cases where, as here, some basis for a claim exists despite the failure of an attorney to undertake an adequate pre-filing investigation into whether that basis actually existed. For example, in Calloway v. Marvel Entertainment Group, 854 F.2d 1452, 1470 (2d Cir.1988), rev'd in part on other grounds sub nom. Pavelic & LeFlore v. Marvel Entertainment Group, 493 U.S. 120, 110 S.Ct. 456, 107 L.Ed.2d 438 (1989), Judge Winter noted that
 
 
 39
 [i]n considering sanctions regarding a factual claim, the initial focus of the district court should be on whether an objectively reasonable basis for the claim was demonstrated in pretrial proceedings or at trial. Where such a basis was shown, no inquiry into the adequacy of the attorney's pre-filing investigation is necessary.
 
 
 40
 See also Greenberg v. Hilton Int'l Co., 870 F.2d 926, 934-35 (2d Cir.1989); Oliveri v. Thompson, 803 F.2d 1265, 1275 (2d Cir.1986) ("[R]ule 11 is violated only when it is 'patently clear that a claim has absolutely no chance of success.' ") (quoting Eastway Const. Corp. v. City of New York, 762 F.2d 243, 254 (2d Cir.1985); Wurzberg v. Lapid, 1993 WL 362374, * 7, 1993 U.S.Dist. LEXIS 12799, * 21 (S.D.N.Y.); Bleckner v. General Accident Ins. Co., 713 F.Supp. 642, 650 (S.D.N.Y.1989).
 
 
 41
 Indeed, this court has remarked that we "have interpreted [Rule 11's] language to prescribe sanctions, including fees, only in the 'exceptional circumstance' ... where a claim or motion is patently unmeritorious or frivolous." Doering v. Union County Bd. of Chosen Freeholders, 857 F.2d 191, 194 (3d Cir.1988) (citation omitted). Taken as a whole, these cases support the notion that sanctions are inappropriate where, as here, there was a reasonable basis for a complaint even if the attorney filing it failed adequately to inquire into the existence of that basis.
 
 
 42
 I believe the majority is mistaken in asserting that this rule would frustrate the purposes of Rule 11. The Supreme Court has stated that
 
 
 43
 the central purpose of Rule 11 is to deter baseless filings in the District Court and thus, consistent with the Rule Enabling Act's grant of authority, streamline the administration and procedure of the federal courts.... Although the rule must be read in light of concerns that it will spawn satellite litigation and chill vigorous advocacy ... any interpretation must give effect to the rule's central goal of deterrence.
 
 
 44
 Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 393, 110 S.Ct. 2447, 2454 (1990). Similarly, the Advisory Committee indicated that the purpose of Rule 11 is "to discourage dilatory or abusive tactics and to help streamline the litigation process by lessening frivolous claims or defenses." Notes of the Advisory Committee on Rules, 1983 Amendment, Fed.R.Civ.P. 11, reprinted in 97 F.R.D. 165, 200 (1983).
 
 
 45
 On the whole, the goals of deterring abuses of the system and streamlining litigation would be better served by the standard I advocate. Because the vast majority of "shots in the dark" will not hit their target, almost all of them will be subject to sanction. I find it difficult to believe that this slightly reduced probability of sanction will encourage lawyers to take blind shots. The deterrent function of Rule 11 to prevent baseless filings will not be undermined by not sanctioning when a complaint on its face does have merit. As the Second and Seventh Circuits have implicitly recognized, the best evidence of an inadequate investigation will often be the fact that a complaint states a frivolous claim. Without that evidence, the inquiry becomes considerably more speculative.
 
 
 46
 Moreover, in cases in which the complaint states a meritorious claim, we must consider whether we want to encourage a secondary line of inquiry into the adequacy of the attorney's research. I believe that opening up such a line of attack, which will require courts to engage in pure speculation in the worst case and will lead to a waste of the court's time and resources in the best case, will create a greater clog in the courts' efficient functioning than will the failure to sanction the rare case of the successful shot in the dark.
 
 
 47
 The majority is eager to sanction counsel in this case because it believes sanctions are necessary to discourage the indiscriminate filing of lawsuits. As I have pointed out above, it is unlikely that the majority's rule would have a greater effect in this regard than my standard. Ironically, however, the majority's approach will encourage the indiscriminate filing of motions for sanctions. This case, in which the motion for sanctions was prepared before defendants had even seen the Garr complaint and was waiting at the courthouse for the complaint to be filed, provides a perfect example of the sort of behavior that the majority's reasoning will encourage. Were the court to hold that facially meritorious but inadequately investigated complaints are not subject to sanction, defendants would have less incentive to file such motions. Indeed, defendants under such a regime would more likely be subject to sanction for filing an unmeritorious motion for sanctions before conducting an adequate investigation into the merit of the complaint.
 
 
 48
 Simply stated, I believe that the majority, in its eagerness to uphold sanctions against the inexcusable behavior by the attorneys in this case, overlooks the fact that its holding will frustrate rather than further the goals of Rule 11. I would reverse the district court's imposition of Rule 11 sanctions against Levin and Sklar.
 
 SUR PETITION FOR REHEARING
 
 
 June 29, 1994.
 BEFORE: SLOVITER, Chief Judge, and BECKER, STAPLETON, MANSMANN, GREENBERG, HUTCHINSON, SCIRICA, COWEN, NYGAARD, ALITO, ROTH, LEWIS, and ROSENN, Circuit Judges.
 
 
 
 49
 The petition for rehearing filed by the appellants, Arnold Levin and Harris Sklar, in the above captioned matter having been submitted to the judges who participated in the decision of this court and to all the other available circuit judges of the court in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circiut judges of the circuit in regular active service not having voted for rehearing by the court in banc, the petition for rehearing is denied. Judges Becker, Stapleton, Roth, and Lewis would grant rehearing by the court in banc.
 
 
 
 [1]
 This arrangement reverses the traditional regime which contemplates that the client start the steps towards formation of an attorney-client relationship by seeking legal representation
 
 
 [2]
 Robert K. Greenfield is not related to the Richard D. Greenfield of Greenfield & Chimicles
 
 
 [3]
 The complaints alleged that Greenfield owned 2,000 shares and the Garrs owned 400 shares. The Strunk complaint asserted that Strunk owned an undesignated number of shares
 
 
 [4]
 Malone sent Davis a copy of the Greenfield complaint on November 5, 1992
 
 
 [5]
 Isquith did not sign the Strunk complaint and thus could not be subjected to sanctions by reason of its filing
 
 
 [6]
 None of the parties contends that the amendments to Rule 11 effective December 1, 1993, are germane here. Thus, we do not discuss them
 
 
 [7]
 Malone obtained this information rapidly through the use of computer information retrieval services