

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-19-1999

# Raymark Ind Inc v Butera BeaUnited Statesng, Cohen & Brennan, P.C.

Precedential or Non-Precedential:

Docket 97-2020

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"Raymark Ind Inc v Butera BeaUnited Statesng, Cohen & Brennan, P.C." (1999). *1999 Decisions.* Paper 287.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/287

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed October 18, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 97-2020

**LAUREEN RYAN, as Trustee of the
Bankruptcy Estate of
Raymark Industries, Inc.,
        Appellant

v.

BUTERA, BEAUSANG, COHEN & BRENNAN,
A PROFESSIONAL CORPORATION,
MICHAEL F. BEAUSANG, JR., ESQUIRE, INDIVIDUALLY

**Per Court Order dated 11/6/98

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civ. No. 97-00034)
District Judge: Honorable John R. Padova

Submitted pursuant to Third Circuit Rule 34.1(b)
October 1, 1999

BEFORE: GREENBERG, NYGAARD and ALITO,
Circuit Judges

(Filed: October 18, 1999)

James D. Coleman
Raymond A. Quaglia
Ballard, Spahr, Andrews & Ingersoll
1735 Market Street
51st Floor
Philadelphia, PA 19103

Attorneys for Appellant
Raymark Industries, Inc.

Alan A. Turner
Turner & McDonald
1725 Spruce Street
Philadelphia, PA 19103

Attorneys for Appellees

Brian M. Cogan
Stroock, Stroock & Lavan
180 Maiden Lane
New York, NY 10004

Attorney for Appellant
Laureen Ryan as Trustee of
the Bankruptcy Estate of
Raymark Industries, Inc.

OPINION OF THE COURT

GREENBERG, Circuit Judge.

I. FACTUAL AND PROCEDURAL HISTORY

Raymark Industries, Inc. ("Raymark") on this appeal
seeks the reversal of an order of the district court denying
it the return of a $1 million fee designated a "non-
refundable retainer" it paid to its former counsel, Michael
Beausang ("Beausang"), of the Pennsylvania lawfirm of
Butera, Beausang, Cohen & Brennan ("Butera, Beausang").
While Laureen Ryan as trustee of Raymark's bankruptcy
estate has been substituted as appellant, as a matter of
convenience we continue to refer to Raymark as the
appellant. We set forth the unusual background of the case

2

at some length. Beginning in the early 1970s, many persons instituted asbestos personal injury actions against Raymark which was a manufacturer of asbestos-containing products. Apparently as a result of these claims and the litigation, Raymark's financial position deteriorated leading in 1989 to certain of its creditors filing an involuntary bankruptcy proceeding against it. The filing of the bankruptcy petition stayed the asbestos actions but the stay was vacated on August 9, 1996, when the bankruptcy court dismissed the bankruptcy proceedings.

Raymark anticipated that the vacation of the stay would lead to a renewed high volume of asbestos litigation.[1] Accordingly, Raymark organized a nationwide network of attorneys to process the anticipated litigation. To secure legal representation, Raymark offered the potential heads of six trial teams a contract with a fixed-fee structure of quarterly payments, a set fee for costs per day at trial, and an initial, one-time, non-refundable payment of $1 million.[2] Raymark used this arrangement to attract counsel with "specific capability" as well as to overcome its history of nonpayment of legal fees.

_____

1. We indicated in Raytech Corp. v. White, 54 F.3d 187, 189 (3d Cir. 1995), that "[b]y June 26, 1988, Raymark had been named as a defendant in more than 68,000 cases."

2. The disputed provision of September 4, 1996 Agreement provides as follows:

> In consideration for the legal representation and services hereunder,
> Raymark agrees to pay Counsel fees as follows:
>
> (a) Initial jurisdiction legal network organizatio nal fee and management fee of $1,000,000. This is a non-refundable retainer.
>
> (b) A fixed quarterly fee of $32,000 to organize  and maintain a legal
> network to handle all administrative aspects of litigation filed against Raymark in the jurisdiction assigned herein.
>
> (c) A fixed quarterly fee of $280,000 for manage ment of the litigation
> filed against Raymark in the jurisdiction assigned herein.
>
> (d) A fixed trial fee of $3,000 per day of trial  not to exceed a total of
> $15,000 per trial without prior approval of Raymark.
>
> All fees paid shall be non-refundable.

Raymark developed an Agreement reflecting its proposed arrangement for retaining counsel which, according to its president, James Cobb, it offered to Beausang and other counsel on a "take it or leave it" basis.3 The Agreement did not address the withdrawal of counsel,4 but included a provision that "Raymark may terminate this Agreement at will and without cause upon ninety (90) days' written notice to Counsel. All fees paid as of the termination date shall be non-refundable." Raymark and Beausang individually entered into the Agreement on September 4, 1996, but there is no doubt that other attorneys from Butera, Beausang, as well as Beausang personally, were to perform the services under the Agreement. Thus, as a practical matter there is no material distinction on this appeal between Beausang and Butera, Beausang.

On September 11, 1996, Beausang sent a letter ("Letter Agreement") to Raymark acknowledging receipt of the $1 million and stating that "[g]iven the significant impact on my practice, I would not have accepted this engagement had this fee not been fully earned and non-refundable." Cobb signed and returned that letter as "acknowledged and agreed." Thus, the contract documents between Raymark and Beausang consisted of the Agreement and Letter Agreement, each of which both parties signed, and each of which referred to the $1 million payment. See Landreth v. First Nat'l Bank, 31 A.2d 161, 163 (Pa. 1943) (all writings forming part of same transaction are interpreted together).5

The Raymark–Beausang arrangement had a short operative life as on November 13, 1996, Raymark

_____

3. Raymark continued to employ five firms under the Agreement after terminating Beausang.

4. Under Pennsylvania law, which the parties agree is applicable, an attorney "may withdraw from representation only for reasonable cause and upon reasonable notice." Novinger v. E.I. DuPont de Nemours & Co., 809 F.2d 212, 218 (3d Cir. 1987).

5. We reject Raymark's argument that Beausang's"self-serving" Letter Agreement should not be regarded as part of the contract because Beausang wrote it after receiving the payment. While Raymark is no doubt correct that the Letter Agreement was self-serving, the fact is that Cobb signed it.

terminated Beausang without notice effective immediately. Raymark based the termination at least in part on Beausang's seeking up to a month's time to review the facts behind a complaint drafted by another attorney that Raymark requested Beausang to file immediately. Raymark hired alternate counsel the same day.6 During the approximately ten-week duration of the Agreement, Butera, Beausang recorded 335.5 hours of work for Raymark and incurred out-of-pocket expenses of approximately $37,000. On January 3, 1997, Raymark filed a complaint for recovery of the $1 million in the district court, predicating its claim on theories of rescission and breach offiduciary duty. Beausang thereafter filed a counterclaim seeking additional fees that he claimed were due under the Agreement.

The parties subsequently filed cross-motions for summary judgment. The district court decided the case in a comprehensive opinion dated December 1, 1997, and on December 2, 1997, entered summary judgment for Beausang on the complaint thus rejecting Raymark's claims. See Raymark Indus., Inc. v. Butera, Beausang, Cohen & Brennan, No. Civ. A. 97-0034, 1997 WL 746125 (E.D. Pa. Dec. 1, 1997). But the court entered judgment for Raymark on the counterclaim, thus leaving the parties where it found them.

The court concluded that the Agreement was "clear and unambiguous," id. at *8, and was agreed upon fairly by sophisticated parties, id. at *10-11. The court said that its clear meaning was that the $1 million fee was non-refundable, id. at *8, and that the parties by the Agreement intended to secure Beausang's commitment and availability to represent Raymark. Id. at *13. Accordingly, the court

_____

6. We note that Beausang surely was correct when he insisted upon having an opportunity to investigate the complaint. See Garr v. U.S. Healthcare, Inc., 22 F.3d 1274 (3d Cir. 1994). Indeed, Raymark does not contend that it is entitled to a return of the retainer on the theory that Beausang violated his obligations under the Agreement. The substituted attorney filed the complaint on the day that Raymark terminated Beausang but the court subsequently dismissed the complaint. See Raymark Indus., Inc. v. Butera, Beausang, Cohen & Brennan, No. Civ. A. 97-0034, 1997 WL 746125, at *5 n.13 (E.D. Pa. Dec. 1, 1997).

determined that the disputed fee was a "general retainer."
See Id. at *13. The court also held that Beausang earned
the fee because Raymark benefitted from paying the fee by
attracting counsel for an unspecified amount and duration
of work despite Raymark's history of nonpayment of legal
fees. Furthermore, taking note of the obvious fact that
Raymark did not "hesitate at all in terminating" Beausang,
the court held that Raymark's right to end its relationship
with Beausang had not been "chilled." See id. at *15.
Therefore, the court concluded that the contract was
equitable under McKenzie Construction, Inc. v. Maynard,
758 F.2d 97, 101-02 (3d Cir. 1985). While as we have
indicated, the court also rejected Beausang's counterclaim,
inasmuch as Beausang does not cross-appeal, we need not
explain why it did so.

Raymark appealed but thereafter, on March 18, 1998,
filed a Chapter 11 petition. See In re Raytech Corp., 222
B.R. 19, 23 (Bankr. D. Conn. 1998). Subsequently, a
bankruptcy court appointed Laureen Ryan as trustee for
Raymark but as we have indicated we continue to refer to
Raymark as the appellant. The district court exercised
diversity of citizenship jurisdiction under 28 U.S.C. S 1332,
and we exercise jurisdiction under 28 U.S.C. S 1291.

II. DISCUSSION

We first must determine whether the Agreement was
enforceable, and, if so, whether or not its enforcement is
unreasonable. In so doing, we exercise our supervisory
power over attorney-client fee arrangements, see Dunn v.
H.K. Porter Co., 602 F.2d 1105, 1108-09 (3d Cir. 1979), a
duty also imposed by Pennsylvania law which the district
court applied and which the parties agree is applicable. In
this regard, we point out that under Pennsylvania law, "[a]
duly admitted attorney is an officer of the court and
answerable to it for dereliction of duty." Childs v. Smeltzer,
171 A. 883, 886 (Pa. 1934); see also In re Mitchell, 901 F.2d
1179, 1183 (3d Cir. 1990). Accordingly, we assess the
reasonableness of attorney-client fees "[e]ven with respect
to market determined fees." See Coup v. Heckler, 834 F.2d
313, 324 (3d Cir. 1987).

6

Insofar as we are aware, the Pennsylvania appellate courts have not determined the circumstances, if any, in which attorneys may use contracts providing for non-refundable retainers.7 Thus, the district court had little guidance when it made its prediction on how the Pennsylvania Supreme Court would assess the enforceability and reasonableness of a contractual provision for a non-refundable retainer. See Raymark, 1997 WL 746125, at *7, *9. Lacking such guidance, the district court predicted that Pennsylvania would adopt our decision in McKenzie, 758 F.2d 97, to evaluate the reasonableness of a non-refundable retainer. The district court then concluded that such retainers, though subject to review for reasonableness, would be permissible under Pennsylvania law. See Raymark, 1997 WL 746125, at *10-14. The parties do not question the court's decision to base its analysis upon McKenzie, though they disagree about how to apply the holding in that case here.8

---

7. Raymark argues that the "current trend" among other jurisdictions is toward limiting the use of non-refundable retainers by attorneys. Brief at 11. This trend, however, may be in cases involving "special retainers" rather than "general retainers," a distinction we discuss below. See, e.g., Kelly v. MD Buyline, Inc., 2 F. Supp.2d 420, 425-27, 444-52 (S.D.N.Y. 1998). But see Provanzano v. National Auto Credit, Inc., 10 F. Supp.2d 44, 51 n.13 (D. Mass. 1998) (observing that "general retainers have largely disappeared from the modern practice of law").

The Pennsylvania Bar Association Legal Ethics and Professional Responsibility Committee, in a Formal Opinion, accurately stated that Pennsylvania law does not bar the use of general retainers. App. at 346-47; Pa. Bar Ass'n, Formal Op. 100 (1995) (non-refundable retainers permissible if reasonable and not "clearly excessive").

8. The parties dispute our standard of review. Raymark understandably argues that inasmuch as this appeal is from an order for summary judgment our review is plenary. On the other hand, Beausang contends that we should use an abuse of discretion standard. See McKenzie Constr., Inc. v. Maynard, 823 F.2d 43, 44 (3d Cir. 1987) (opinion following remand); McKenzie, 758 F.2d at 102. We need not determine which standard applies as we would reach the result we do exercising plenary review.

7

## 1. McKenzie Standard

In McKenzie, which arose in a fee dispute rather than a disciplinary context, we rejected the use of a "clearly excessive" standard as to whether or not attorneys' fees are reasonable, and instead adopted an "equity and fairness standard." 758 F.2d at 100-02 (rejecting standard of A.B.A. Model Code of Professional Responsibility Disciplinary Rule 2-106 (A) especially where potential unreasonableness arises from circumstances after fee arrangement is made). We asked (1) whether the attorney's conduct, as against the client's conduct, had resulted in a fee that enriched the attorney at the client's expense, and (2) whether that enrichment violated the court's "sense of fundamental fairness and equity." Id. at 101 ("[W]hen the matter is the enforcement of a fee contract in an adversary proceeding between an attorney and his former client, . . . the court is not deciding whether a lawyer's conduct is unethical but whether, as against the client, it has resulted in such an enrichment at the expense of the client that it offends a court's sense of fundamental fairness and equity.").

In making this evaluation, we stated that attorney-client fee agreements were not to be enforced as "ordinary commercial contracts." Id. Rather, a court must evaluate the contract as to its reasonableness both as of the time the parties entered into it and in light of subsequent circumstances concerning performance and enforcement, which may make a contract "unfair in its enforcement." Id. We went on to state "that courts should be reluctant to disturb contingent fee arrangements freely entered into by knowledgeable and competent parties." Id.

Applying the McKenzie standard, the district court reviewed Raymark's contract both at the time the parties entered into it and in light of Beausang's termination and the amount of work he performed. It concluded that the contract was "fair to both parties when made."9 In so doing,

_____

9. Raymark appears to agree that the contract is on its face enforceable, arguing only that the early termination makes enforcement impermissible. "Raymark does not dispute that defendants' receipt of a $1 million non-refundable retainer was reasonable in the context of a 30-month engagement during which defendants were expected to be engaged in substantial litigation . . . . Nonetheless, this $1 million fee became manifestly unreasonable at the time of defendants' termination . . . ." given the limited amount of time and work devoted. Brief at 22.

8

the court considered basic principles of contract law because while special scrutiny is given to attorney-client arrangements, the relationship between attorney and client under Pennsylvania law nevertheless is contractual. See Novinger v. E.I. DuPont de Nemours & Co., 809 F.2d 212, 218 (3d Cir. 1987).

The court determined first that the contract was unambiguous, a conclusion with which we are in accord. Thus, this is a case in which we are concerned with construction rather than interpretation of a contract. See Dardovitch v. Haltzman, ___ F.3d ___, 1999 WL 689955, at *8 (3d Cir. Sept. 7, 1999). Raymark nevertheless argues that we should consider the intent of the parties in entering into the contract as expressed in a deposition of its consultant, Craig Smith. Brief at 4-5. The district court, however, correctly stated that unless the writing is ambiguous, the parties' mutual intent must be determined from the language of the writing itself. See Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 613 (3d Cir. 1995) (applying Pennsylvania law). The court stressed that Raymark had set the Agreement's terms, the parties were sophisticated, and Beausang had borne the risk that, given the set-fee structure, his costs could exceed the payments received. The heart of the court's analysis of the enforceability of the contract, however, derives from its discussion of the nature of the retainer provision itself.

2. General Retainer

Beausang argues that the $1 million fee was non-refundable not only under basic contract principles but because it was a general retainer so that its non-refundability would be recognized in Pennsylvania as well as other jurisdictions. See, e.g., Kelly v. MD Buyline, Inc., 2 F. Supp.2d 420, 425-27, 444-52 (S.D.N.Y. 1998) (non-refundable general retainers permissible though New York law bars non-refundable special retainers). Raymark counters that the retainer was a specific or special retainer, which by an extension of principles of professional ethics must be refundable. Brief at 24-25.

The district court found as a matter of law that the Agreement more resembled a general retainer than a

9

special retainer and we agree with that conclusion.10 However, as Raymark points out, that finding is not dispositive, because Pennsylvania law does not establish definitively that non-refundable general retainers are lawful. Nevertheless, the district court's ruling in that regard does bolster its conclusion that the contract was enforceable under the McKenzie standard.

The distinction between general and specific retainers is well established. A retainer is general "where the services being purchased are the attorney's `availability' to render a service if and as needed in a specific time frame" and thus is "earned when paid." On the other hand, a retainer is special or specific "where the funds paid are for a specific service." In that circumstance, the retainer remains the client's property if the contemplated services are not provided. See In re Gray's Run Tech., Inc., 217 B.R. 48, 52–53 (Bankr. M.D. Pa. 1997); see also Kelly, 2 F. Supp.2d at 425–27.11

In Gray's Run, the bankruptcy court held that an attorney's claim to retain a non-refundable retainer, described in the contract as "an advance fee retainer" and

_____

10. Raymark argues that the distinction is immaterial under Pennsylvania law, and that determining whether this is a general or special retainer is in any case a fact-intensive issue that is inappropriate
for summary judgment. Reply Brief at 3–4. Yet the distinction is at least useful towards analyzing the propriety of the contract, even if it is not dispositive. Federal bankruptcy courts confronted with similar issues arising in Pennsylvania have discussed the distinction. See, e.g., In re Gray's Run Tech., Inc., 217 B.R. 48, 52–53 (Bankr. M.D. Pa. 1997).

11. Special or specific retainers have been sub-divided into security retainers and advance fee retainers. An attorney holds a security retainer to "secure payment of fees for future services." A security retainer is to be applied "to charges for services actually rendered, normally after the submission and approval of an application for compensation." The second kind of special retainer is the advance fee retainer arrangement, in which "the attorney receives payment in advance for contemplated legal services and depletes the prepaid fund as services are rendered. Advance fee retainers differ from security retainers in that ownership of the funds is intended to pass to the attorney at the time of the payment." In re The Renfrew Ctr. of Fla., Inc., 195 B.R. 335, 338–39 (Bankr. E.D. Pa. 1996).

10

as "our payment in advance for contemplated legal services," could not be upheld because it was a special retainer. In that case, the agreement for the attorney's services described the retainer as an "advance" payment for a specific service rather than as a payment for the purchase of the attorney's availability. See Gray's Run, 217 B.R. at 51-52. In reaching its conclusion, the court considered the following facts (but did not hold them out as a test or inclusive list): that no reference was made in the contract to securing "availability," that no amount was "set apart . . . that could be interpreted as consideration separate from counsel's hourly rate," and that the contract "specifically articulate[d] that the retainer [was] of an advance fee nature and in payment of contemplated services." Id. at 55. In the circumstances, the court concluded that the fee, though intended to be non-refundable, was a special retainer that the attorney was obligated to return.

We agree with the district court in this case that the language of the Agreement indicates that the parties intended the $1 million to be a non-refundable, general retainer and that the provision for non-refundability is valid under Pennsylvania law.12 First, while the contract does not use the term "available," on its face it requires Beausang to be available to handle an indeterminate amount of litigation for an unspecified amount of time. In fact, Raymark expected the work to last "at least 30 months," and Beausang clearly anticipated long-term work. Raymark's Brief at 6; Beausang's Brief at 15. Second, the contract specifically outlines in a separate clause from the one providing for the $1 million retainer how Raymark will pay Beausang for legal services rendered. Third, the Agreement describes the $1 million as a "non-refundable retainer," before setting forth in other clauses the terms for payment

_____

12. While the district court unquestionably described the agreement as having the characteristics of a "general retainer" it made limited use of that term. See Raymark, 1997 WL 746125, at *13. Raymark, however, acknowledges that the court found that the Agreement provided for a "general retainer," as it indicates in its brief that the court's findings in part "rest[ ] upon the erroneous premise that the Agreement comprised a so-called `general retainer.' " Brief at 23.

11

of litigation costs and for managing the legal team. These provisions demonstrate that Raymark understood the $1 million to be a one-time payment, not an "advance" upon which Beausang could draw as expenses related to litigation or administration mounted. Raymark's acceptance of the Letter Agreement also shows that Raymark understood that the $1 million was "fully earned" and non-refundable. Accordingly, we conclude that the district court correctly held that there was no question of material fact regarding whether the contract was a permissible, enforceable agreement with a $1 million fee as a non-refundable, general retainer. See Dardovitch, 1999 WL 689955, at *8.

3. Reasonableness and Equity

After concluding that on its face the Agreement was enforceable, the court, as McKenzie requires, assessed the reasonableness of the Agreement in light of subsequent events, namely, Raymark's termination of the Agreement. See McKenzie, 758 F.2d at 101. In making this analysis, the court held that instead of merely calculating the amount that Beausang had earned on an hourly basis, it could consider benefits beyond those paid for "legal services."[13] Raymark, 1997 WL 746125, at *12. Finding that the legal and organizational services were to be covered by other payments, the court determined that the $1 million was a "carrot" or "financial incentive" used to attract Beausang and was reasonable. Id. at *13. The court reasoned that Raymark had spent $1 million to buy the "opportunity" to use Beausang's services at capped costs -- analogizing this to an options contract, where the option is worth something, though less than the fully-realized opportunity. Id. Thus, the court concluded that Beausang had earned the $1 million, despite working for only ten weeks, because Raymark paid the $1 million for access to

_____

13. The district court noted that while Pennsylvania law allows courts in the context of confessions of judgment to reduce unreasonable awards, see Raymark, 1997 WL 746125, at *9, no standard exists to measure the reasonableness of an amount. See, e.g., PNC Bank v. Bolus, 655 A.2d 997, 1000 (Pa. Super. Ct. 1995) (charge of more than $70,000 for attorney fees for filing single document "blatantly unreasonable").

12

Beausang's services on terms favorable to Raymark. Id. at *12–13.

In light of the McKenzie standard, the district court correctly reasoned that Beausang "cannot be exposed to the reproach of oppression and overreaching" regarding retaining the fee. Id. at *14. The court discussed at length a case similar to McKenzie decided by the Court of Appeals for the Ninth Circuit in which a prominent attorney recovered a $1 million contingency fee pursuant to a written agreement after filing a petition for certiorari. Id. at *14 n.31. See Brobeck, Phleger & Harrison v. Telex Corp., 602 F.2d 866 (9th Cir. 1979). While the client in Brobeck thought that the fee was unreasonable and excessive, the court of appeals in rejecting this argument took into account the sophistication of the parties, the fact that the client wished to attract a certain caliber of attorney, and the fact that the client, after negotiations with the attorney, had proposed the fee arrangement which it later challenged. Id. at 875.

The district court in this case made a similar analysis predicated on the facts presented here. Furthermore, Raymark's complaint regarding the $1 million fee is weaker than the client's position in Brobeck as Raymark offered the fee to Beausang on a "take it or leave it" basis. In Brobeck and here, the attorneys clearly were paid very well, but the context of the payments and the fact that the clients received some intangible benefits in retaining the attorneys meant that the courts could conclude that the compensation in each case was not so high as to be inequitable and unfair.

Raymark argues that, even if the district court properly decided that the $1 million was a general retainer fee, still Beausang did not prove that he would not be limited to recovery in quantum meruit. The Pennsylvania courts have recognized that an attorney with a contract to perform a specific service for a specific fee who is discharged may recover a proper amount for his services on a quantum meruit basis. See Hiscott and Robinson v. King, 626 A.2d 1235, 1236 (Pa. Super. Ct. 1993); Sundheim v. Beaver County Bldg. & Loan Ass'n, 14 A.2d 349, 351 (Pa. Super. Ct. 1940). But this general rule for specific fee contracts

13

does not fit the facts in this case. Rather, we are concerned with a situation in which an attorney with a general retainer has been discharged. In that situation, he may recover "at least in some circumstances, beyond payment for the value of services already rendered." Kelly, 2 F. Supp.2d at 449. The facts here present one of those circumstances. In addition, the basic principle that attorneys should not receive "unearned" income is not in jeopardy here because the district court correctly concluded that Raymark did receive benefits -- though not in the form of legal services rendered on an hourly basis -- for its payment of $1 million.

4. Chilling effect on right to terminate counsel

Raymark further contends that its right to discharge its attorneys was "chilled" by its inability to recoup some portion of the $1 million. Raymark argues that special retainers hold a client hostage to the attorney. Raymark analogizes this case to Cohen v. Radio-Electronics Officers Union, 679 A.2d 1188 (N.J. 1996), in which the Supreme Court of New Jersey held unenforceable a provision negotiated by sophisticated parties in which the client was required to give the attorney six months' notice before it could terminate the contract. The court held that this provision chilled the client's right to terminate its relationship with the attorney. Id. at 1197-1201. The court concluded, however, that the attorney was entitled to reasonable notice of termination, which it determined was one month rather than the three days the client gave.

To the extent that Cohen is inconsistent with our result, we decline to follow it.14 It appears clear that the retainer in Cohen was general rather than special, see Cohen v. Radio-

_____

14. We could distinguish Cohen on the theory that Cohen's $100,000 annual compensation was for 1,000 hours of service and thus was different from the $1 million retainer here which was not tied directly to services to be performed measured on a temporal basis. Moreover, in this case Raymark was to pay Beausang ongoing fees on a quarterly basis plus fees for trial time directly linked to days of service. The tenor
of Cohen is such, however, that we doubt that the Supreme Court of New Jersey if confronted with the facts of this case would distinguish it from Cohen.

14

Electronics Officers Union, 645 A.2d 1248, 1261 (N.J. Super. Ct. App. Div. 1994) (Villanueva, J., dissenting), but the court did not seem to consider this point in reaching its decision. At the very least, the Supreme Court of New Jersey did not say that it was reaching its result because the retainer was special rather than general. Nevertheless our review of cases in other jurisdictions convinces us that the distinction between general and special retainers is crucial with respect to non-refundability of an attorney's fees. We believe that Cohen best can be understood in the context of the New Jersey Supreme Court's historically strong powers to regulate attorneys under the New Jersey Constitution. See Cohen, 679 A.2d at 1195-96. As a federal court making a determination of state law in a diversity case, we think that we should predicate our ruling on more conventional principles. See Leo v. Kerr-McGee Chem. Corp., 37 F.3d 96, 101 (3d Cir. 1994).

It is true that in Pennsylvania "[t]he right of a client to terminate the attorney-client relationship is an implied term of every contract of employment of counsel. . . ." See Hiscott and Robinson, 626 A.2d at 1237. Nevertheless, this principle is not in jeopardy here because Beausang does not contend that Raymark could not discharge him. In any event, we are satisfied that regardless of the chilling effect of a non-refundability provision in a general retainer, the client's right to terminate an attorney must accommodate an attorney's right to retain the non-refundable retainer.

Finally, we recognize that Raymark argues that there exists "a substantial factual issue as to whether and to what extent Raymark's right to discharge counsel was chilled." But this argument does not require that we reverse the district court. First, of course, as is obvious and as the district court found, Raymark did not hesitate to terminate Beausang. Second, the argument proves too much because it always could be contended that after paying a non-refundable general retainer a client would be reluctant to discharge an attorney and thereby surrender the benefit it obtained by payment of the retainer.

III. CONCLUSION

In summary, we carefully have reviewed all arguments which Raymark has put forward, mindful of the obligations

15

of attorneys to their clients. After making that review, we find no reason to disturb the conclusions of the district court. Consequently, the order of December 2, 1997, will be affirmed.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

16